1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10 BENJAMIN FLOURNOY, | Civil No.        08-2298 IEG (POR) |
| 11                                  Petitioner, | |
| 12                    vs. | **REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| 13 LARRY SMALL, Warden, et al., | |
| 14                                  Respondents. | |

15   **I.      INTRODUCTION**

16          Benjamin Flournoy (Flournoy) is a California prisoner serving a sentence of forty years-to-life

17   in prison.  In San Diego Superior Court case number SCD186632, Flournoy was convicted on February

18   27, 2006, of assault with intent to commit rape and forcible rape.  (Lodgment No. 4, vol. 1 at 0212-13.)

19   Flournoy also admitted to having been convicted of three serious felonies and three "strike" priors

20   within the meaning of California's Three Strikes law.  (Lodgment No. 3, vol. 8 at 1220-21.)

21          Flournoy has filed a Petition (Pet.) for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254

22   challenging his convictions.  He contends his Sixth Amendment rights to confrontation and cross

23   examination were violated by the trial court's rulings, his Sixth Amendment right to effective assistance

24   of trial counsel was violated, his federal due process right to a fair trial was violated by the trial court's

25   evidentiary rulings and the cumulative effect of these errors rendered his trial fundamentally unfair, in

26   violation of his federal due process rights.  (Pet. at 6-9a; Pet'rs Mem. P. & A. Supp. Pet. at 11-39.)

27   / / /

28   / / /

This Court has reviewed the Petition, Respondent's Answer, the Traverse, and all supporting documents. After a thorough review of the record, the Court finds that Petitioner is not entitled to the relief requested and **RECOMMENDS** that the Petition be **DENIED**.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal's opinion denying Flournoy's direct appeal of his conviction:

### A. *People's Case*

#### 1. *L.M. meets Flournoy*

L.M. was raised in Portland. After graduating from high school, she moved to San Diego and began attending Mesa College. She did not have a car and so traveled by bus. This required her to often transfer at Ninth Street and Broadway in downtown San Diego. In late October 2003, she met Flournoy while walking to Ninth Street to catch her bus. He approached and said he had seen her a couple of days before and he was "checking [her] out." They spoke for approximately 15 minutes while L.M. was waiting for her bus.

The following day L.M. again encountered Flournoy at the same corner. Flournoy asked L.M. her name, but she responded that she did not have one. As they were talking, L.M. noticed that the batteries in her compact disc player had died. Flournoy went to a nearby store and returned with some batteries, which he gave her. While they continued waiting for L.M.'s bus, Flournoy must have written his telephone number on a piece of paper and put it among her books, as she found the paper there when she was later on the bus.

L.M. thought Flournoy was "cool" and friendly because he had bought the batteries for her. A few days later, she called him. Flournoy returned her call and invited her to stroll around downtown. L.M. was not interested in Flournoy as a boyfriend because he was substantially older than she. She estimated that he was roughly the same age as her father. Nevertheless, she agreed to meet Flournoy because she did not know many people in San Diego.

L.M. met Flournoy at First Street and Broadway. As they walked, Flournoy tried to hold her hand, but at first she would not let him. However, when he reached for her hand a second time, she let him. Later, Flournoy tried to kiss her, but L.M. pushed him away. Flournoy responded, "Quit playing." At the end of the evening, Flournoy tried to kiss her again, but she again pushed him away. L.M. then caught her bus home.

/ / /

### 2. *The rape*

On October 30, 2003, Flournoy called L.M. to invite her over to his apartment to watch a basketball game. L.M. had told him previously that she wanted to watch the game, but her television was broken. L.M. called her best friend in Portland, Charlene Thomspon, who advised her not to go. Nevertheless, L.M. decided to go and called Flournoy. They met at First Street and Broadway and then went to his apartment at the J Street Inn. L.M. did not plan on staying too late as the last bus left at either midnight or one a.m. However, she brought a duffle bag with some school books with her.

When they arrived at the J Street Inn, L.M. signed in at the front desk. They then went up to Flournoy's studio apartment, which was furnished with a bed and a small futon. L.M. sat on the futon and watched television while Flournoy left to lock up some buildings. When Flournoy returned, he sat next to her and then laid his head in her lap. L.M. pushed him away and told him to move. He responded, "Quit playing. Just let me lay on your lap." L.M. responded, "Man, whatever," and let him stay where he was.

L.M. and Flournoy discussed her lack of trust in people. Flournoy told her she could trust him. Flournoy then went into the bathroom and changed into his pajamas. He sat back down on the futon and told her he was going to bed because he had to get up early the next morning. L.M. continued to watch television as Flournoy climbed into bed. L.M. watched television too long and missed her last bus. Because she did not have money for a cab, she decided to wait until she could catch the bus in the morning. L.M. decided to lie down, but the futon was too small. Around 2:00 a.m., she lay down, fully clothed except for her shoes, on top of the covers on Flournoy's bed. When she got cold, she climbed under the covers and fell asleep.

L.M. was awakened by Flournoy, who was on top of her. Her shorts were pulled down around her ankles, and her T-Shirt and sweatshirt were pulled up. [Flournoy] was kissing her neck, breasts and vagina. When she woke up and realized what was happening she tried to push him off with her hands and said, "Move." Flournoy responded, "Scoot down," and pulled her legs toward him. L.M., who is 5 feet, 3 inches tall, tried to get him off her by pushing him with her hands and legs, but Flournoy got in a position where he was able to insert his penis into her vagina. L.M. felt pain in her vagina when he inserted his penis. Ultimately, she was able to free herself by kicking Flournoy off her.

As she got out of bed and bent down to pick up her clothes, she hit her head on the arm of the futon. Flournoy asked her if she wanted him to walk her downstairs. L.M. replied, "I don't want you to do a fuckin' thing for me." She was crying as she left his apartment.

On her way out of the J Street Inn, L.M. passed a security guard who asked her what was wrong. She was too upset to respond and wanted to get out of the building as soon as possible. At trial the security guard, Alvin Thomspon, confirmed that on the night of the rape, a young African-American woman ran crying out of the building. A few minutes later, Flournoy came into the lobby and asked which direction the woman had gone. L.M. ran past Horton Plaza, towards 12th Street. Eventually she was able to catch a bus back home.

### 3. *Sexual assault exam*

Once L.M. came home she decided to go to the hospital because her ovaries were hurting. Her ovaries had been hurting for several days, and she had put off going to a doctor. Without taking a shower or changing her clothes, she went to Mercy Hospital.

L.M. did not intend to report the rape because she did not want her parents to find out she had gone to Flournoy's apartment. At the hospital, however, because she was crying, a nurse kept asking her what was wrong. She initially told the nurse that she was crying because of the pain, but the nurse did not believe her. Because she thought it would make her less blameworthy, L.M. lied and told the nurse that she had been raped in an alley behind her apartment by someone she did not know. After she told this story to a physician, the hospital called police. When police arrived, she told them the same false story.

L.M. went to a different hospital to have a sexual assault exam. The police took her clothes and she was given a hospital gown and underwear. The exam was conducted by Shirley Odum, a registered nurse. L.M. allowed Odum to take swabs from her breasts and external genitalia. Odum also took blood and urine samples. However, L.M. would not let Odum use a speculum in the examination.

Odum observed two recent injuries: an abrasion to L.M.'s posterior fourchette and one to the labia minora. The abrasions appeared to be recent and were consistent with blunt-force trauma that occurred between midnight and 2:00 a.m. In Odum's opinion, the abrasions were mounting-type injuries consistent with a penis being forced into a vagina. However, she could not determine if they were from consensual or nonconsensual intercourse.

### 4. *L.M.'s statements to others about rape*

L.M. later called her friend Thompson and told her about the rape. She told Thompson that she had gone to Flournoy's apartment to watch a basketball game and had fallen asleep. When she awoke, Flournoy was on top of her and raped her. Throughout the conversation, L.M. was upset, scared and panicky. When Thompson told her she should call the police, L.M. made her promise not to tell anyone, not even her parents. L.M. was afraid of how people would react.

L.M. also called her aunt, Deangeloa Wells, who lived in Portland, and told her in general terms about the rape, but did not identify her attacker. Wells told her parents, and L.M.'s father drove down to San Diego and took her back to Portland. Before she left for Portland, she received a message on her answering machine from Flournoy, who said he was sorry and that it was not supposed to happen. The message was later deleted.

L.M. remained in Portland through the Christmas holidays, giving up her job in San Diego and dropping her classes. While she was at church with her aunt Wells during this period, Wells told her, "Okay. You can fool everybody else. You can't fool me, because I know you . . . . What really happened? Because the story you just told doesn't add up." L.M. then told Wells the truth. L.M. told her what happened at Flournoy's apartment. L.M. told her she initially lied because she was too embarrassed about her lack of judgment. Wells told her to call the police and tell them the truth because Flournoy should be punished. While still in Portland, L.M. called San Diego Police Detective Mike Holden and told him the truth.

### 5. *Police investigation*

When L.M. returned to San Diego, Detective Holden prepared a six-photo lineup, including a picture of Flournoy in position No. 2, and showed it to L.M. L.M. positively identified Flournoy as her attacker. L.M. then accompanied Detective Holden downtown and pointed out the J Street Inn as the location where the rape took place. Detective Holden contacted the manager and inspected a room similar to the one Flournoy had been staying in October 2003. The room had a layout that was similar to Flournoy's, as described to him by L.M.

In June 2004 Detective Holden left a business card at Flournoy's apartment. Flournoy called Detective Holden and agreed to speak with him at the station. At the station, Detective Holden told Flournoy he was being accused of raping L.M. Detective Holden asked Flournoy if he knew L.M., reminding him that he had met her at a bus stop the previous fall and had walked around downtown with her. He also showed a picture of L.M. to Flournoy. Flournoy denied ever having seen L.M. before. He further denied the possibility that he simply did not remember her and stated that he would have remembered if he had sex with her. At the conclusion of the interview, Flournoy voluntarily provided a DNA sample.

Criminalist Amy Rogala worked in the forensic biology section of the San Diego Police Department's crime laboratory (the crime lab) and recovered male DNA from the swab taken from L.M.'s breast. The information was run through the state DNA database, which identified Flournoy as a possible match. In order to confirm the results, Criminalist Adam Dutra analyzed the samples Flournoy had provided during his interview with Detective Holden, and the results showed a positive match. Rogala reviewed Dutra's report and concluded that there was a 1-in-41 quintillion chance that an African-American selected at random would have the same DNA. Persons from other racial groups were an even less likely match.

Two sperm cells were recovered from the swab taken from L.M.'s external genital area, which was an insufficient amount from which to create a DNA profile based on short tandem repeat (STR) testing. There was, however, a sufficient sample from which to conduct the less sensitive YSTR testing — testing based upon on the Y chromosome string. The result revealed a positive match with Flournoy's DNA. The likelihood of such a match with a random sampling of African-American males was 1 in 1,100. Two sperm cells were recovered from the panties L.M. was given to wear for the sexual assault examination. They were also an insufficient amount from which to conduct DNA tests.

In an interview with Detective Holden, L.M. described several items she had observed in Flournoy's apartment, including several record albums, a record player, a comforter, and a picture of a small boy. When Detective Holden obtained a search warrant and searched Flournoy's apartment, he discovered the items L.M. had described.

6. *Flournoy attempts to contact L.M.*

In March 2005 L.M. had a parttime job at a restaurant on 12th Street and Market. One day in March 2005, after L.M. had identified Flournoy as the perpetrator at the preliminary hearing, she saw Flournoy looking into the restaurant while he was sitting on a bench waiting for the trolley. L.M. was scared and hoped that he did not recognize her. She contacted Detective Holden and reported the incident to him.

The following morning, L.M. and her boss, Cherrie Johnson, were preparing to open the restaurant for business. As L.M. stood next to the inside of the restaurant's door, Flournoy walked past. At first he did not appear to see L.M. However, he then recognized her and tried to open the door, which was locked. L.M. was so scared she was shaking. Flournoy kept saying, "I need to talk to you." As L.M. backed away from the door, Johnson asked her what was wrong. L.M. responded, "That's him." L.M. had told Johnson about the rape. Johnson told Flournoy, "Get out of here. Get the 'F' out of here." Flournoy persisted, trying to open the door several times, and telling Johnson, "I need to talk to her."

Johnson advised L.M. to call the police and gave her a cell phone to do so. When Flournoy saw L.M. dialing he said, "Don't call the police. I'm out of here," and left.

Johnson confirmed L.M.'s account of the encounter.  L.M. had previously told her about the rape.  Johnson had been driving L.M. to work because Flournoy had been released from jail and L.M was afraid to be on her own.  On the day of the encounter, Johnson heard L.M. say, "He's here."  Flournoy was at the door saying, "I just want to talk to you.  I know I'm not supposed to talk to you.  I just want to talk to you."  Johnson told Flournoy to leave.  Flournoy took a few steps back, but then returned.  He repeated this action four to five times.  L.M. was shaking during the encounter.

Detective Holden, who had made a previous arrangement to meet L.M. at the restaurant that day and was parked across the street, observed Flournoy attempt to contact L.M.  L.M. was still visibly shaking when Detective Holden later spoke with her.

### B.  *Defense Case*

Two witnesses who knew Flournoy testified that the shirt L.M. wore to the hospital was the type of shirt that he would typically wear.  Two other witnesses testified that at the time of the rape, Flournoy had a sofa in his apartment that was large enough for a grown man to stretch out on.

Jessica Gomez, who described herself as a former friend of L.M. and former friend of Flournoy's sister, testified that L.M. had described the rape to her.  L.M. told her that she took off all her clothes except for her bra and underwear before getting into bed with Flournoy.

Cari Caruso, a forensic nurse, examined the reports from L.M.'s sexual assault examination.  She concluded that the abrasions L.M. suffered were "minor" and were consistent with consensual intercourse.

During closing arguments, defense counsel argued that Flournoy reasonably misinterpreted L.M.'s acts such as climbing into bed and other nonverbal communication as consent to have intercourse.  According to defense counsel, the shirt L.M. wore to the hospital was given to her by Flournoy because she was going to spend the night.

(Lodgment No. 1, App. 1 at 3-11.)

## III.  PROCEDURAL BACKGROUND

On February 10, 2005, the San Diego County District Attorney filed an information charging Benjamin Flournoy with one count of forcible rape (count one), a violation of California Penal Code (Penal Code) section 261(a)(2) and one count of assault with intent to commit rape (count two), a violation of Penal Code section 220.  (Lodgment No. 1, vol. 1 at 0001-02.)  The information also alleged that Flournoy had suffered three serious felony prior convictions, within the meaning of Penal Code sections 667(a)(1), 668 and 1192.7(c) and three "strike" prior convictions, within the meaning of Penal Code sections 667(b) – (i), 668 and 1170.12.  (*Id.* at 0002-03.)

Following a jury trial, Flournoy was convicted of both counts.  (*Id.* at 0212-13.)  Flournoy admitted he had suffered the prior convictions as alleged in the information.  (Lodgment No. 3, vol. 8

at 1219-21.)  Flournoy was sentenced to twenty-five years to life on count one as the principal term.  As to count two, the court imposed an additional term of twenty-five years to life, but stayed the sentence pursuant to Penal Code section 654.[1]  (Lodgment No. 3, vol. 9 at 1252.)  The court also sentenced Flournoy to five years for each of the serious felony prior convictions pursuant to Penal Code section 667(a)(1), for a total additional prison term of fifteen years.  The total sentence Flournoy received was forty years to life in prison.  (*Id.*)

Flournoy appealed his conviction to the California Court of Appeal.  (Lodgment Nos. 5, 6.)  The court affirmed Flournoy's convictions in a written, unpublished opinion.  (Lodgment No. 1, App. A.)  Flournoy thereafter filed a petition for review in the California Supreme Court, which that court denied without citation of authority.  (Pet., Ex. C.)  Flournoy then filed a Petition for Writ of Habeas Corpus in the California Supreme Court.  (Lodgment No. 2.)  The petition was denied in an Order stating, "The petition for writ of habeas corpus is denied.  (See *In re Waltreus* (1965) 62 Cal. 2d 218."  (Pet., Exs. A, C.)

On December 10, 2008, Flournoy filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, together with a Memorandum of Points and Authorities in Support of the Petition and Exhibits, in this Court.  (Doc. No. 1.)  Respondent filed an Answer and Memorandum of Points and Authorities in support of the Answer on March 19, 2009.  (Doc. No. 8.)  Petitioner filed a Traverse on September 15, 2009.  (Doc. No. 17.)

**IV.    DISCUSSION**

A.    *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of

---

[1]  California Penal Code section 654(a) states, in pertinent part:

> An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.

clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). Additionally, the state court's factual determinations are presumed correct, and Flournoy carries the burden of rebutting this presumption with "clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West 2006).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal

1  law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme

2  Court at the time the state court renders its decision." *Lockyer*, 538 U.S. at 72.

3          B.    *Analysis*

4          Flournoy raises four claims in his petition.  First, he argues the trial court violated his Sixth

5  Amendment confrontation rights by permitting criminalist Amy Rogala to testify about DNA evidence

6  contained in reports prepared by another criminalist, Adam Dutra.  (Pet. at 6; Pet'rs Mem. of P. & A.

7  Supp. Pet. at 11-16.)  Second, he claims trial counsel rendered ineffective assistance, in violation of his

8  Sixth Amendment rights.  (Pet. at 7; Pet'rs Mem. of P. & A. Supp. Pet. at 17-18.)  In his third and fourth

9  claims, Flournoy contends the trial court's admission of testimony by the L.M's aunt and boss about

10 statements she made to them violated his federal due process right to a fair trial.  (Pet. at 8-9; Pet'rs

11 Mem. of P. & A. Supp. Pet at 19-35.)  Finally, Flournoy claims the cumulative effect of all the errors

12 rendered his trial fundamentally unfair, in violation of his federal due process rights.  (Pet. at 9a; Pet'rs

13 Mem. of P. & A. Supp. Pet at 36-39.)

14         Respondent argues Flournoy's first claim is procedurally defaulted.  (Mem. of P. & A. Supp.

15 Answer at 14-17.)  Respondent also argues that  Flournoy has not established counsel was ineffective

16 because there were valid tactical reasons for counsel not to object and because any objection would have

17 been futile.  (*See* Mem. of P. & A. Supp. Answer at 12-24.)  Respondent also contends that Flournoy

18 has not established the admission of L.M's statements through her boss, Cherrie Johnson, or her aunt,

19 Deangeloa Wells, violated his due process right to a fair trial.  (*Id.* at 24-30.)  Finally, Respondent

20 argues that Flournoy's trial was not rendered fundamentally unfair due to cumulative error.  (*Id.* at 31.)

21         1.    *Admission of Testimony Regarding the DNA Tests (Claim One)*

22         Flournoy first contends that his Sixth Amendment right to confront and cross examine the

23 witnesses against him was violated when the trial court permitted the results of the DNA testing to be

24 admitted via the testimony of criminalist Rogala, who did not perform the testing.  (Pet. at 6; Pet'rs

25 Mem. of P. & A. Supp. Pet at 11-16.)  Respondent counters first that the claim is procedurally defaulted

26 because counsel did not make a timely objection to the evidence.  (Mem. of P. & A. Supp. Answer at

27 12-17.)  Respondent also argues that the claim fails on the merits because the state court correctly

28 / / /

1   concluded Rogala's testimony regarding the contents of the DNA tests was admissible as an expert

2   opinion and that the tests themselves were admissible as business records.  (*Id.* at 17-23.)

3        Flournoy exhausted this claim by raising it in the petition for review he filed in the California

4   Supreme Court, which denied the claim without citation of authority.  (*See* Lodgment No. 1, App. A;

5   Lodgment No. 2, Ex. B.)  Thus, this Court must "look through" to the state appellate court's opinion on

6   direct review as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court concluded Flournoy's

7   challenge to the evidence failed for several reasons.  First, the court found that Rogala's testimony

8   regarding the results of the DNA testing, which was performed by criminalist Dutra, was admissible

9   under California law as expert opinion testimony independent of whether the DNA testing documents

10  themselves were admissible. (Lodgment No. 1, App. A at 14-15.)  Specifically, the court stated that "it

11  was permissible for Rogala to testify concerning her opinion as to the likelihood that another person

12  would share the same DNA recovered from L.M. based upon calculations or tests conducted by [the

13  other criminalists] Dutra and Ballard, even though such matter constituted hearsay." (*Id.*)  Second, the

14  court reasoned that the DNA tests themselves were admissible as business records. (*Id.* at 15-17.)  With

15  regard to the Sixth Amendment challenge, the court wrote:

16        B. *Analysis*

17        . . . .

18        3. *Confrontation clause*

19        In addition to challenging Rogala's testimony on state hearsay grounds, Flournoy
20   asserts that it violated his federal Sixth Amendment right [to] confront and cross-
     examine Dutra.  This contention is unavailing.

21        a. *Waiver*

22        First, Flournoy has waived the right to raise this issue on appeal.  While he
     objected on hearsay grounds, no confrontation clause objection was made.  A claim that
23   there has been a violation of the confrontation clause must be timely asserted at trial or
     it is forfeited on appeal.  (*People v. Burgener* (2002) 29 Cal.4th 155, 186 [same].)

24        b. *Merits*

25
26        Even if Flournoy did not waive the right to assert this argument on appeal, it is
     not well taken.

27        Flournoy asserts the admissions of the DNA evidence from a scientist who did
     not do the analysis violated his right to confrontation as determined by the United States
28   Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Contrary
     to

appellant's contention, *Crawford* does not negate the established rule that experts can relate the information and sources upon which they rely in forming their opinions, as the information is not admitted for its truth and the expert is available for cross-examination. (*Id.* at p. 59, fn. 9.) Thus, Flournoy's confrontation rights were not violated when Rogala testified to the laboratory report prepared by Dutra under Rogala's supervision.

The United States Supreme Court explained in *Crawford* that the core concern of the confrontation clause is testimonial hearsay, which includes statements made during police interrogations and prior testimony at a preliminary hearing, before a grand jury, or at trial. (*Crawford*, *supra*, 541 U.S. at pp. 50-53, 68.) The court held that such statements are inadmissible when the declarant is unavailable unless the defendant had a prior opportunity to cross-examine. (*Id.* at p. 68.) However, the confrontation clause does not bar the use of testimonial statements "for purposes other than establishing the truth of the matter asserted." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9; see also, *Tennessee v. Street* (1985) 471 U.S. 409, 414.) Accordingly, "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions." (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.) This is so for two reasons. First, the materials upon which the expert relies are not elicited for their truth, but, rather, are examined to assess the weight of the expert's opinion. (*Ibid.*; *People v. Fulcher* (2006) 136 Cal.App.4th 41, 56-57; see also *Delaware v. Fensterer* (1985) 474 U.S. 15, 19; *People v. Coleman* (1985) 38 Cal.3d 69, 90, 92-93.) Secondly, an expert is subject to cross-examination about his or her opinions. (*Thomas*, *supra*, 130 Cal.App.4th at p. 1210.) Thus, even assuming that the population frequency figures contained in the lab report were "testimonial," its admission as a basis for the expert opinion rendered did not violate Flournoy's confrontation rights under *Crawford*.

Moreover, because we have concluded, *ante*, that the reports Rogala relied upon were business records, they were not "testimonial hearsay" under *Crawford*. The United States Supreme Court in *Crawford* held that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." (*Crawford*, *supra*, 541 U.S. at p. 68.) Business records were identified by the court as nontestimonial hearsay. (*Id.* at pp. 53-56.)

For example, in *People v. Taulton* (2005) 129 Cal.App.4th 1218 (*Taulton*), the Court of Appeal was presented with the question of whether prison records of prior convictions were "testimonial" under *Crawford*. The court, relying on *Crawford*, noted that business records "are prepared for many purposes but not to provide evidence in a potential criminal trial or to determine whether criminal charges should issue. One of the requirements for the admissibility of business records is that '[t]he writing was made in the regular course of a business. . . .' [Citation.]" (*Taulton*, *supra*, 129 Cal.App.4th at p. 1224.) The court explained that because business records generally are not prepared for the purpose of being used as evidence in a trial, they are not testimonial under *Crawford*. The court held that prison records are not testimonial because they are prepared to document acts and events relating to convictions and incarceration. And, "[a]lthough they may ultimately be used in criminal proceedings, as the documents were here, they are not prepared for the purpose of providing evidence in criminal trials or for determining whether criminal charges should issue." (*Taulton*, *supra*, 129 Cal.App.4th at p. 1225.) Accordingly the admission of prison records under the business record hearsay exception does not implicate the confrontation clause. (*Ibid.*; see also *People v. Martinez* (2000) 22 Cal.4th 106, 116; *People v. Purcell* (1937) 22 Cal.App.2d 126, 132; cf. *People v. Saffold* (2005) 127 Cal.App.4th 979, 984 [a proof of service not testimonial hearsay under *Crawford*]; *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1413 [lab report "routine documentary evidence" nontestimonial under *Crawford*].)

1    Likewise in this case, because the DNA reports fell within the business records
2    exception to the hearsay rule, the reports were not testimonial hearsay under *Crawford*.

3    (Lodgment No. 1, App. A at 18-21.)

4        a.    *Procedural Default*

5    Respondent first contends Flournoy's claim that his Sixth Amendment confrontation clause

6    rights were violated by the admission of the testimony regarding the DNA testing is procedurally

7    defaulted.  (Mem. of P. & A. Supp. Answer at 14-17.)  As quoted above, before reaching the merits of

8    the claim, the state court found Flournoy had waived his right to raise the Sixth Amendment claim on

9    appeal because counsel had objected to the testimony only on hearsay grounds and not on Sixth

10   Amendment grounds.  (Lodgment No. 1, App. A at 18.)

11   The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent

12   must first have "adequately pled the existence of an independent and adequate state procedural ground

13   . . . ." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the defense at issue,

14   Flournoy must then "assert[] specific factual allegations that demonstrate the inadequacy of the state

15   procedure . . . ." *Id.*  The "ultimate burden" of proving procedural default, however, belongs to the state.

16   *Id.*  If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Flournoy

17   can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal

18   law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of

19   justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

20   Respondent has met his initial burden under *Bennett*.  *See Paulino v. Castro*, 371 F.3d 1083,

21   1092-93 (9th Cir. 2004) (finding claim procedurally defaulted by imposition of the contemporaneous

22   objection rule).  To meet his burden under *Bennett* and rebut Respondent's showing, Flournoy must

23   "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . . "

24   *Bennett*, 322 F.3d at 586.  Flournoy has presented no such allegations.  (*See* Pet.; Pet'rs Mem. of P. &

25   A. Supp. Pet; Traverse.)  Accordingly, federal review of the claim is barred unless Flournoy can

26   demonstrate cause for the default and actual prejudice or a fundamental miscarriage of justice.

27   *Coleman*, 501 U.S. at 750.

28   / / /

i. *Cause*

The cause prong is satisfied if Flournoy can demonstrate some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky v. Zant*, 499 U.S. 467, 493-94 (1991). Flournoy does claim that counsel was ineffective for failing to challenge the admission of the DNA evidence on Sixth Amendment grounds. (Pet. at 7; Pet'rs Mem. of P. & A. Supp. Pet at 17-18.) As discussed below, however, in section IV(B)(2) of this Report and Recommendation (R&R), this Court concludes that counsel was not ineffective when he failed to challenge the admission of testimony on Sixth Amendment grounds. Accordingly, this cannot form the basis for a successful showing of cause under *Coleman*. Flournoy does not allege any other "objective factor" that precluded him from raising this claim, and thus he has not established cause for the default. *McClesky*, 499 U.S. at 493-94.

ii. *Prejudice*

"Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). Flournoy has failed to establish prejudice. As discussed below in section IV(B)(1)(b) of this R&R, Flournoy would not be entitled to relief in this Court even if it reached the merits of his claim since this Court has been unable to locate any published case at the time of Flournoy's direct appeal that applied *Crawford* to bar the testimony of a criminalist who testified about DNA test results performed by others. Moreover, as discussed below, his claims are barred by *Teague v. Lane*, 489 U.S. 288 (1989). *Coleman*, 501 U.S. at 750.

iii. *Fundamental Miscarriage of Justice*

Flournoy has also failed to demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. The Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "Actual innocence" means factual innocence, not merely legal insufficiency; a mere showing of reasonable doubt is not enough. *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997). Although Flournoy challenges the method by which the DNA test results were admitted into evidence, he does not challenge the veracity or reliability of the DNA tests themselves. Thus, Flournoy has not demonstrated that he is actually

innocent of the crimes of which he has been convicted.  Accordingly, and for the foregoing reasons, the Court recommends that ground one be **DISMISSED** as procedurally barred.  *See Bennett*, 322 F.3d at 586.

        b.     *Teague and the Applicability of Melendez-Diaz to Flournoy's Case*

At the time of Flournoy's conviction, the clearly established Supreme Court law governing his Sixth Amendment claim was *Crawford v. Washington*, 541 U.S. 36 (2004).  *Crawford* held that when the prosecution seeks to admit "testimonial evidence" from a witness who is not present at the trial, "the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Id.* at 68.  The *Crawford* court did not define the term "testimonial," but gave some guidance, stating that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

During the pendency of Flournoy's case in federal court, however, the United States Supreme Court decided *Melendez-Diaz v. Massachusetts*, __ U.S. __ 127 S. Ct. 2527 (2009) which extended *Crawford*'s reasoning to at least some kinds of scientific tests.  The *Melendez-Diaz* Court held that certificates which confirmed the substance seized from the defendant was cocaine  were "testimonial" under *Crawford* and could not be admitted absent the testimony of the person who performed the tests. *Id.* 2531.  The Supreme Court specifically rejected the argument that the certificates were business records and therefore admissible pursuant to the business records exception to the hearsay rule. *Id.* at 2538-40.  The Court also rejected the argument that because the certificates were the product of "neutral, scientific testing," they were not testimonial. *Id.* at 2536-38; *see also Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 195 (2004) (holding that statements made in response to questioning during an investigative stop are "testimonial"); *Davis v. Washington*, 547 U.S. 813, 827, 830 (2006) (holding that statements made to a 911 operator, when made in order to "describe current circumstances requiring police assistance," were not testimonial, but a  victim's later statements to police, were).  At least one California court has since applied the reasoning of *Melendez-Diaz* to DNA tests and concluded that they may not be admitted absent the testimony of the analyst who performed the testing. *See People v. Dungo*, 176 Cal. App. 4th 1388, *review granted*, 102 Cal. Rptr. 382 (2009).

/ / /

08cv2298

1    *Melendez-Diaz* was decided in 2009, two years after Flournoy's conviction became final.  Thus,

2    in order for Flournoy to benefit from its holding, this Court must determine whether *Melendez-Diaz* can

3    be applied retroactively to Flournoy's case under *Teague*.   In general, a new procedural rule of

4    constitutional law announced after a habeas petitioner's conviction became final are not retroactive.

5    There are two exceptions: (1) "rules forbidding punishment of certain primary conduct or  . . . rules

6    prohibiting a certain category of punishment for a class of defendant because of their status or offense;

7    and (2) "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the

8    criminal proceeding." *Beard v. Banks*, 542 U.S. 406, 416-17 (2004).  Only the second exception is

9    relevant in the present case.

10    The Court has not located any published decisions which address whether *Melendez-Diaz*

11    announced a new rule.  Several district courts, however, have issued unpublished opinions on the matter.

12    All have concluded that *Melendez-Diaz* announced a new rule under *Teague* and thus it may not be

13    applied retroactively on collateral review.  The Court finds the reasoning of these cases persuasive.[2]

14    The first step in a *Teague* analysis is to determine whether *Melendez-Diaz* is a "new rule."  The

15    Court in *Teague* stated as follows:

16    > It is admittedly often difficult to determine when a case announces a new rule, and we
    > do not attempt to define the spectrum of what may or may not constitute a new rule for
    
17    > retroactivity purposes.  In general, however, a case announces a new rule when it breaks
    > new ground or imposes a new obligation on the States or the Federal Government . . . .
    
18    > To put it differently, a case announces a new rule if the result was not *dictated* by
    > precedent existing at the time the defendant's conviction became final.

19

20    *Teague*, 489 U.S. at 301 (citations omitted).

21    Courts conducting a *Teague* analysis, therefore, must "ascertain the legal landscape as it . . .

22    existed [when Flournoy's conviction became final on October 10, 2007] and ask whether the

23    Constitution, as interpreted by the precedent then existing, compel[led] the rule." *Beard*, 542 U.S. at

24    411 (citation and internal quotation marks omitted).  When a case extends the reasoning of a prior

25

26    ───────────────

27    [2]  *Vega v. Walsh*, 2010 WL 1685819 (E.D.N.Y., April 22, 2010); *Silva v. Warden*, 2010 WL 987026
(D.N.H., March 17, 2010); *Fort v. Grant*, 2010 WL 996754 (D. Mass, March 17, 2010); *Wilbourn v. Johnson*,
WL 785615 (W.D. Va., March 5, 2010); *Newsome v. Superintendent*, 2010 WL 597943 (N.D. Ind., Feb. 17,

28    2010); *Louder v. Coleman*, 2009 WL 4893193 (W.D. Pa., Dec. 10, 2009); *Carillo v. United States*, 2009 WL
4675789 (N.D. Ill., Dec. 3, 2009); *Frankenberry v. Coleman*, 2009 WL 3734140 (W.D. Pa., Nov. 6, 2009);
*Larken v. Yates*, 2009 WL 2049991 (C.D. Cal., July 9, 2009).

decision, as is the case with *Melendez-Diaz*, it is more difficult to determine whether the case is a new rule.  The Supreme Court in *Melendez-Diaz* characterized its decision as a "straightforward application of . . . *Crawford*," but the result in that case was certainly not a forgone conclusion for the four Justices who dissented in *Melendez-Diaz*.  *See Melendez-Diaz*, 129 S.Ct. at 2543-61 (Kennedy, J., Roberts, J., Breyer, J. and Alito, J., dissenting).  Indeed, before *Melendez-Diaz*, several circuit courts considered *Crawford*'s application to the admissibility of testimony about test results by individuals who did not perform the testing and came to the conclusion that *Crawford* did not bar such evidence.  *See United States v. Richardson*, 537 F.3d 951, 960 (8th Cir. 2008) (holding that expert's testimony about DNA testing completed by others did not violate the Sixth Amendment); *United States v. De La Cruz*, 514 F.3d 121, 133-34 (1st Cir. 2008) (holding that autopsy reports were not testimonial under *Crawford*); *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) (finding that a testifying expert need not have performed the tests himself in order to comply with *Crawford*).  It seems clear to this Court that *Melendez-Diaz* announced a new rule under *Teague*.  *Teague*, 489 U.S. at 301.

Assuming *Melendez-Diaz* did announce a new rule, the Court is persuaded that it is a procedural rule which is not applicable to Flournoy's case unless it is a "watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding."  *Whorton v. Bockting*, 549 U.S. 406, 418-19 (2007) (holding that *Crawford* is a new procedural rule but not a watershed rule).  A watershed rule is one which is necessary to prevent "an impermissibly large risk of an inaccurate conviction . . . and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of the proceedings."  *Id.* at 418.  This is an extremely narrow exception that is rarely applied.  As the Supreme Court noted in *Whorton*, not a single rule has been found to be a "watershed rule of criminal procedure" since *Teague* was decided.  *Id.* at 418.  The Supreme Court in *Whorton* concluded that *Crawford* was not a watershed rule.  Because the Court characterized *Melendez-Diaz* as a "straightforward application of *Crawford*," *Melendez-Diaz* cannot be a watershed rule, either.

For the foregoing reasons, assuming *Melendez-Diaz* is applicable to Flournoy's Sixth Amendment challenge to the DNA evidence, its application to Flournoy's case is impermissible under *Teague*.  *Teague*, 489 U.S. at 301.  He is not entitled to relief as to this claim.

/ / /

2.       *Ineffective Assistance of Counsel (Claim Two)*

In his petition, Flournoy contends counsel was ineffective when he failed to object to Rogala's testimony regarding the DNA testing completed by Dutra on Sixth Amendment confrontation clause grounds.  (Pet. at 7; Pet'rs Mem. of P. & A. Supp. Pet. at 17-18.)  Respondent counters that trial counsel had valid, tactical reasons for not challenging the DNA evidence and any objection would have been futile because the evidence was admissible.  (Mem. of P. & A. Supp. Answer at 17-23.)  Respondent also argues Flournoy has not established he prejudiced by counsel's alleged error.  (*Id.* at 24.)  In his Traverse, Flournoy argues counsel was also ineffective for failing to call Dr. Laura Slaughter, an expert apparently retained by defense counsel to review the Sexual Assault Response Team (SART) report and the testimony of the Sexual Assault Nurse Examiner (SANE), Shirley Odum.  (Traverse at 1-10.)  Flournoy claims Dr. Slaughter would have cast sufficient doubt on L.M's claim of sexual assault such that he would have been acquitted.  (Traverse at 1-10.)

a.       *Failure to Object to Rogala's Testimony on Sixth Amendment Grounds*

At trial, counsel objected to the admission of Rogala's testimony about the results of DNA testing performed by another criminalist on state hearsay grounds but not on Sixth Amendment confrontation clause grounds.  (*See* Lodgment No. 3, vol. 5 at 916-19.)  This resulted in the claim being denied on procedural grounds, as well as on the merits, in state court and dismissed as procedurally barred in this Court.  Flournoy raised this claim in the petition for review he filed in the California Supreme Court on direct review.  (Lodgment No. 1.)  That court denied the petition for review without citation of authority.  (*See* Lodgment No. 2, Ex. B.)  Accordingly, this Court must "look through" to the appellate court's opinion rejecting this claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  Citing both California and United States Supreme Court law, the state appellate court concluded that counsel was not ineffective because Rogala's testimony was properly admitted on two grounds: (1) "[it] was not inadmissible hearsay; and (2) [it] did not violate the confrontation clause."  (Lodgment No. 1, App. A at 22.)

To establish ineffective assistance of counsel, Flournoy must first establish that his trial counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984) "This requires a showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689. Second, he must show counsel's deficient performance prejudiced the defense. *Id.* at 687. This requires a showing that counsel's errors were so serious they deprived Flournoy "of a fair trial, a trial whose result is reliable." *Id.* To satisfy the prejudice prong, Flournoy must demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address whether counsel's performance was deficient if the claim can be resolved by determining whether a defendant suffered sufficient prejudice as a result of counsel's alleged errors. *Id.* at 697.

It is questionable whether counsel's failure to object to Rogala's testimony was objectively reasonable under *Strickland*. A competent lawyer probably should have preserved the issue for appellate review. Flournoy has not established he was prejudiced, however, because he has not shown that the result of the proceeding would have been different absent the error. The Court has located no published California or Ninth Circuit case that applied the Sixth Amendment analysis of *Crawford* to testimony about DNA test results by an expert who did not perform the tests at the time of Flournoy's trial. Indeed, the weight of authority was squarely against such an application, particularly in California where the California Supreme Court held in 2007 that such evidence was not testimonial under *Crawford*. *See People v. Geier*, 41 Cal. 4th 555, 596-607 (2007) (collecting cases). Thus, there is no likelihood that a Sixth Amendment objection to Rogala's testimony would have been sustained at the trial court level. Nor is there any likelihood that issue would have been resolved differently on appeal given the ruling in *Geier*.[3] Moreover, Flournoy has not established that even if such an objection had been sustained, the prosecution could not have produced Adam Dutra, the individual who did perform the DNA testing, for testimony at trial, thus curing any Sixth Amendment confrontation clause problem.

For the foregoing reasons, Flournoy has failed to establish the state court's denial of this claim was either contrary to, or an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. He is not entitled to relief as to this claim.

---

[3] *Geier* was decided on July 2, 2007. The California Court of Appeal issued its opinion on direct appeal in Flournoy's case on June 27, 2007 and the California Supreme Court denied his petition for review on October 10, 2007. (Lodgment No. 1, App. A; Lodgment No. 2, Ex. B.)

b.      *Failure to Call Dr. Slaughter*

Flournoy raises a new claim of ineffective assistance of counsel in his Traverse, namely the failure of counsel to call Dr. Laura Slaughter, an expert on SART exams.  "A Traverse is not the proper pleading to raise additional grounds for relief."  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  In addition, neither the petition for review nor the habeas corpus petition Flournoy filed with the California Supreme Court contain this claim.  (*See* Lodgment Nos. 1, 2.)  The claim is therefore not exhausted.  Nevertheless, the Court may deny a habeas petition containing an unexhausted claim if it is "perfectly clear that the applicant does not raise even a colorable claim."  *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

The Court has reviewed the copy of the report Dr. Slaughter presumably submitted to defense counsel detailing the inconsistencies and inaccuracies Dr. Slaughter found in the SART exam and Odum's testimony.  (Traverse, Ex. A.)  Although the report documents numerous minor errors and ambiguities in the SART report, contradictions between the SART report and Odum's testimony, and disagreements between Dr. Slaughter and Odum regarding the meaning of certain terms and the results of the SART exam, nothing in the report points to Flournoy's innocence or establishes that L.M. lied about the rape.  Indeed, Dr. Slaughter's summary states as follows:

> There are a number of minor documentation issues and several major lapses in understanding by [Odum].  Nonetheless, there are documented genital injuries, which are consistent with blunt force penetrating trauma.  The exact object that caused the trauma cannot be determined from the observed injuries.  Genital injury is more likely to occur with a history of non-consensual sex.

(Traverse, Ex. A at 4.)

It is evident from this summary that counsel made a valid, tactical decision not to call Dr. Slaughter because she would not have been helpful to Flournoy's defense.  Even if counsel had called Dr. Slaughter, there is no reasonable probability that the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.  The errors in the report were minor, and Dr. Slaughter's ultimate conclusion did not rule out the likelihood that L.M. was raped.  Accordingly, Flournoy has not established either prong of *Strickland*'s test, and he is therefore not entitled to relief as to this claim.

/ / /

/ / /

1          3.        *Admission of Johnson's and Wells's Testimony (Claims Three and Four)*

2          Flournoy also complains that the admission of testimony by L.M.'s aunt, Deangeloa Wells, and

3    L.M.'s employer, Cherrie Johnson, regarding statements she made to them violated his federal due

4    process right and rendered his trial fundamentally unfair.  (Pet. at 8-9; Pet'rs Mem. of P. & A. Supp. Pet.

5    at 19-35.)   Respondent counters that the statements were properly admitted and did not render

6    Flournoy's trial unfair.  Respondent also notes that any error was harmless under the standard of *Brecht*

7    *v. Abrahamson*, 507 U.S. 609 (1993).

8          Flournoy raised these claims in the petition for review he filed in California Supreme Court on

9    direct review.  (Lodgment No. 1.)   That court denied the petition without citation of authority.

10   (Lodgment No. 2, Ex. B.)   Accordingly, this Court must "look through" to the California Court of

11   Appeal's opinion denying the claims as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  With regard

12   to Wells' testimony, that court analyzed the claim as follows:

13         B. *Analysis*

14         Testimony regarding a victim's disclosure of a sexual assault is admissible "for
     a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances

15   surrounding, the victim's disclosure of the assault to others—whenever the fact that the
     disclosure was made and the circumstances under which it was made are relevant to the

16   trier of fact's determination as to whether the offense occurred."  (*People v. Brown*
     (1994) 8 Cal.4th 746, 749-750.)  However, the testimony should be "carefully limited

17   to the fact that a complaint was made, and to the circumstances surrounding the making
     of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely

18   upon the evidence for an impermissible hearsay purpose."  (*Id.* at p. 762.)  "Caution in
     this regard is particularly important because, if the details of the victim's extrajudicial

19   complaint are admitted into evidence, even with a proper limiting instructions, a jury
     may well find it difficult not to view these details as tending to prove the truth of the

20   underlying charge of sexual assault [citation], thereby converting the victims' statement
     into a hearsay assertion [citation]."  (*Id.* at p. 763.)

21
           Only enough detail should be given to show that the victim's "complaint related

22   to the matter being inquired into, and not a complaint wholly foreign to the subject'
     [citation]; that is, the alleged victim's statement of the nature of the offense and the

23   identity of the asserted offender, without details, is proper."  (*People v. Burton* (1061)
     55 Cal.2d 328, 351, italics omitted.)  For example, in *Burton* the challenged testimony

24   that the victim's stepfather "'made me play with his peter'" (*id.* at pp. 337-338) was
     permissible because it was "simply a statement of the asserted fact without any further

25   description."  (*Id.* at p. 352.)  In *Brown*, the challenged testimony was permissible
     because it was "limited to the timing of the [the victim's] complaint and the

26   circumstances under which it was made, omitting the content of the statements and
     specifically any description of the molestation itself."  (*People v. Brown*, *supra*, 8

27   Cal.4th at p. 764.)

28   / / /

Here, Flournoy objects to the part [of] Wells's testimony that L.M. told her that Flournoy "forcibly had sexual intercourse with her . . . ." However, that statement merely related that a crime had been committed, not the details of the crime itself. It is similar to, and in fact a less factual description of the incident than, the statement approved in *People v. Burton*, *supra*, 55 Cal.3d at pages 338, 352.

(Lodgment No. 1, App. A at 23-24.)

With regard to Johnson's testimony, the California Court of Appeal analyzed the claim as follows:

Evidence code section 1250, subdivision (a) defines the state of mind exception to the hearsay rule as follows: "[E]vidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action . . . ."

The prosecutor offered the statements by L.M to Johnson to show her state of mind—her fear of Flournoy—at the time she made the statement. Accordingly, the evidence was admissible if it was relevant and not unduly prejudicial. (*People v. Thurmond* (1985) 175 Cal.App.3d 865, 871.)

Flournoy contends that this evidence was unduly prejudicial because the jury might have been led to believe that he had been in jail for a long time because it knew he was arrested in November 2004, and the preliminary hearing was in March 2005. However, the record contradicts this assertion. First, Detective Holden testified that he secured an arrest *warrant* for Flournoy in November 2004. He did not testify as to when he was arrested. Two months later he discovered Flournoy's new address and executed a search warrant at that address. Second, the preliminary hearing was held in February, not March 2005. There was also no evidence presented to the jury that Flournoy was still in custody at the time of the preliminary hearing and that he was released only after that time. Johnson testified that she did not know when L.M. told her she was afraid to be on her own or when she began driving L.M. to work. Thus, there was no evidence from which the jury could have concluded that Flournoy was incarcerated from November 2004 to March 2005.

The court did not err in admitting L.M.'s statements to Johnson concerning the rape and her resulting fear of Flournoy.

(Lodgment No. 1, App. A at 27-28.)

Federal habeas relief is not available for alleged violations of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (stating that federal habeas relief is not available for an alleged error in the interpretation or the application of state law); *see also* 28 U.S.C. § 2254(a). Thus, the question whether the evidence was properly admitted under California law is not before this Court. Rather, this Court may only determine whether the admission of the evidence violated Flournoy's due process right to a fair trial. To establish this, Flournoy must show the admission of the evidence rendered his trial

fundamentally unfair. *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996). Any prejudice that may have occurred may be mitigated by the trial court's limiting instructions. *Estelle*, 502 U.S. at 75.

Wells testified that she spoke to L.M. shortly after she returned to Portland. (Lodgment No. 3, vol. 4 at 634.) Wells did not believe L.M.'s story about being attacked from behind in the alley. (*Id.* at 634-35.) Wells pressed L.M. to tell her the truth, and she eventually told Wells that she had been in the apartment of a person she had met at a bus stop and that while she was lying down, this person rolled on top of her and raped her. (*Id.* at 635.) The trial court admitted the evidence under the "fresh complaint" doctrine. (*Id.* at 701-02.) Johnson testified that L.M. told her she felt uncomfortable being alone because she knew Flournoy had gotten out of jail. Johnson also testified L.M. told her she had been raped. (*Id.* at 688-92.)

The trial court overruled counsel's hearsay objections to Wells' and Johnson's testimony. The Court found Wells' testimony was admissible under the fresh complaint doctrine to show the circumstances under which L.M disclosed what had happened to her in order to assist the jury in determining her credibility but not for its truth. (*Id.* at 698-702.) The trial court also concluded that the defense was entitled to an admonition to the jury explaining this. (*Id.* at 702.) With regard to Wells' testimony, the judge instructed the jury as follows:

> THE COURT: [] I allowed Ms. Stephenson to elicit some testimony from Ms. Wells regarding the circumstances under which [L.M.] disclosed certain details of what she states happened to her on the date in question in this case. Now, I admitted that testimony not to prove the truth of what she said that happened, but simply to allow you to hear the circumstances under which she disclosed these things to different people, in this case, Ms. Wells.
>
> And so, that's the extent of my rulings at this time. In other words, you may consider it not for the truth of what's asserted in [L.M.'s] statements, but to consider the circumstances under which she made those disclosures to Ms. Wells . . . .

(*Id.* at 706.)

As to Johnson's testimony, the trial court concluded it was admissible under California Evidence code section 1250 as "state of mind" evidence:

> THE COURT: [] I don't know that the defense is going to be challenging the truthfulness of Ms. Johnson's testimony with regard to the alleged victim's relating that statement to her; but with regard to evidence code section 1250, it seems to me that because the alleged victim initially lied in part, in describing how she was allegedly raped and the circumstances of her disclosure to others is squarely before the jury which is why

> I admitted certain statements under the fresh complaint doctrine.  It seems to me that her state of mind with regard to her testimony here as well, was with regard to the original event is highly relevant to the jury in assessing credibility.  So I believe that relevance of 1250 is directly related to the assessment of the credibility of the witness and that's why I overruled the objection.
>
> And that is a hearsay objection which means the statement that I'm uncomfortable because he's out of jail can be offered and received for its truth.

(*Id*. at 705.)

At the close of the case, the jury was also instructed in the following manner:

> Certain evidence was admitted for a limited purpose.
>
> At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted.
>
> Do not consider this evidence for any purpose except for the limited purpose for which it was admitted.

(Lodgment No. 4, vol. 1 at 0035.)

The trial judge carefully and correctly evaluated the admissibility of Wells' and Johnson's testimony about L.M.'s statements to them.  The jury was given the appropriate limiting instructions with regard to Wells' testimony.  Simply put, Flournoy has not established the court committed any error in admitting the testimony, no less error that rendered his trial fundamentally unfair.  *Ortiz-Sandoval*, 81 F.3d at 897.  Moreover, any prejudice that may have occurred was mitigated by the trial court's limiting instructions.  *Estelle*, 502 U.S. at 75.  In addition, the Court agrees with Respondent that any error that was committed did not have a substantial and injurious effect on the jury's decision and was thus harmless under *Brecht*.  *See Brecht*, 507 U.S. 609 (1993).  L.M. herself testified she made the statements to Wells and Johnson that Flournoy complains about and was cross examined about them.  (*See* Lodgment No. 3, vol. 3 at 448, 461-67.)

For all the foregoing reasons, the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  He is not entitled to relief as to this claim.

/ / /

/ / /

4.      *Fundamental Unfairness/Cumulative Error (Claim Five)*

Flournoy claims the cumulative effect of all the errors committed in his trial rendered his trial fundamentally unfair, violating his federal due process rights.  (Pet. at 9a; Pet'rs Mem. of P. & A. Supp. Pet at 36-39.)   Respondent contends that because Flournoy has failed to establish that any error occurred, his cumulative error claim must fail.  (Mem. P. & A. Supp. Answer at 31.)

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  Flournoy's trial did not suffer from cumulative error, and the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Flournoy is not entitled to relief as to this claim.

**V.  CONCLUSION**

Based on the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED**.  This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than **July 6, 2010**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 20, 2010**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  June 14, 2010

LOUISA S PORTER
United States Magistrate Judge

cc:     The Honorable Irma E. Gonzalez
        All parties

08cv2298